IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:21-cv-00059-MR-WCM

| | |
|---|---|
| RACHEL HOWALD, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> ) <br> PAMELA KAYE HERRINGTON, ) <br> ) <br> Defendant. ) <br> _____ ) | **MEMORANDUM OF** <br> **DECISION AND ORDER** |

**THIS MATTER** is before the Court on the Plaintiff's Motion for Summary Judgment [Doc. 49].

I.   **PROCEDURAL BACKGROUND**

The Plaintiff, Rachel Howald ("Howald"), brought this action in North Carolina state court on November 15, 2020, against Defendants Ben Lippen School ("Ben Lippen") and Pamela Kaye Herrington ("Herrington"). [Doc. 1-1]. The Complaint sets out six claims for relief. In Counts One, Four, and Six, Howald sets out claims against Herrington for assault and battery, false imprisonment, and intentional infliction of emotional distress ("IIED"). [Id.]. In Counts Two, Three, and Five, Howald sets out claims against Ben Lippen

for negligent retention and supervision of Herrington, constructive fraud, and negligent inflection of emotional distress ("NIED"). [Id.].

On February 26, 2021, Ben Lippen filed a notice of removal to the Western District of North Carolina. [Doc. 1]. On March 31, 2021, Ben Lippen filed its answer to the Complaint, and on June 21, 2021, Herrington filed her answer. [Doc. 16, Doc. 29]. On June 29, 2022, the parties and their attorneys participated in a mediated settlement conference which resulted in a settlement of all claims against Ben Lippen. [Doc. 48]. On September 9, 2022, Howald filed the present Motion for Summary Judgment against Herrington. [Doc. 49]. Herrington has not filed a response to the motion and the time for doing so has passed. Accordingly, this motion is unopposed and now ripe for disposition.

## II. STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of demonstrating that no genuine disputes of material fact exist for trial. Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). If this showing is made, the burden then shifts to the nonmoving

party to convince the Court that a triable issue does exist. Id. In considering the facts for the purposes of a summary judgment motion, the Court must view the pleadings and materials presented in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. Adams v. Trustees of the Univ. of N.C.-Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

Where the nonmoving party has not responded to the motion, however, the Court may consider the forecast of evidence presented by the movant to be undisputed for the purposes of the present motion. See Fed. R. Civ. P. 56(e)(2). However, even when a motion for summary judgment is unopposed, this Court must review the motion and "determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993).

## III. UNDISPUTED FACTS

The following is a summary of the relevant portions of Howald's undisputed forecast of evidence.[1] Herrington worked at Ben Lippen as a

---

[1] Since Herrington submitted no response to Howald's Motion for Summary Judgment, this forecast is undisputed. Moreover, this forecast includes evidence that Herrington has admitted the material elements of Plaintiff's factual forecast. [Doc. 49-1 at 7-8]. Therefore, even though the Plaintiff has the burden of proof in this matter, and summary judgment in favor of the party with the burden of proof would not ordinarily be available, the Court

3

coach and "Dorm Parent," a position responsible for enforcing the school's policies. [Doc. 49 at 1]. Herrington lived on campus in an apartment in the school's dormitories. [Doc. 49-1 at 1]. Howald attended Ben Lippen from 1986-1988 and was a member of the teams that Herrington coached. [Doc. 49 at 1]. Herrington took an interest in Howald and treated her differently from the other students, including affording her special privileges such as allowing her to listen to music that was not permitted at the school. [Id. at 1-2; Doc. 1-1 at 4-5].

Herrington first made physical contact with Howald when Howald was sixteen or seventeen years old[2] and a junior at Ben Lippen. [Doc 49-1 at 2]. In the late summer or early fall, Herrington called Howald into her office and told Howald that she was lonely and unhappy and wanted to give Howald a "big hug." [Doc. 49-3 at 27]. Howald told her parents about the hug and recalls her parents telling Howald to "be nice" to Herrington. [Id.]. Later that

---

concludes that there is no genuine issue as to the truth of Plaintiff's forecast and thus summary judgment in favor of the Plaintiff is nonetheless appropriate.

[2] Howald's Complaint alleges that Herrington's first physical conduct occurred during the "volleyball season in 1987." [Doc. 1-1 at 6]. As Howald's birthdate is January 17, 1971, she would have been sixteen at that time. [See Doc. 49-3 at 4]. Howald's Motion for Summary Judgment, however, alleges that Howald was seventeen during the entire period of abuse. [Doc. 49 ¶ 5]. Regardless of Howald's exact age when the abuse began, it is undisputed that Howald was a minor during the period she was abused by Herrington.

fall, while Howald was in Herrington's apartment at Herrington's request,[3] Herrington scratched Howald's back. [Id. at 28].

Herrington's physical contact with Howald escalated following an on-campus movie night. [Doc. 49-1 at 2]. Herrington obtained Howald's parents' permission to have Howald stay in Herrington's apartment following the movie.[4] [Doc. 49-3 at 29]. Howald slept on a mattress that Herrington placed directly next to her own bed. [Id. at 30]. Although Howald found this configuration odd, she did not comment on it because she was feeling sick and just wanted to lie down. [Id.]. At some point during the night, Howald woke up and felt Herrington groping her breast under her shirt. [Id.]. Howald recalls feeling immobilized due to her shock and fright and then passing out from feeling sick. [Id. at 31].

Herrington's abuse of Howald continued throughout the school year. Three or four times a week, Herrington called Howald into her apartment and fondled Howald. [Id. at 31, 33]. Herrington lay on top of Howald and masturbated by grinding against Howald's leg. [Id.]. Howald recalls that this

---

[3] Howald does not recall the particular reason Herrington requested that she meet with her in the apartment but noted that that Herrington was the junior class advisor and would have had numerous reasons to request a meeting. [Doc. 49-3 at 28].

[4] Although Howald thought it was a "little weird" that she was staying overnight with Herrington, Howald noted that her parents did not like driving long distances at night and that Howald did not have a car on campus at night. [Id. at 30].

5

grinding was very painful for her, especially while she was recovering from surgery after a knee operation for a torn ACL. [Id. at 33]. On at least one occasion, Herrington tried to put her fingers in Howald's underwear. [Id. at 32]. Herrington also abused Howald off campus—at a movie night at Howald's home,[5] on an overnight trip to a softball game, and on a leadership retreat. [Id. at 32-34].

Howald did not consent to Herrington's actions, nor did she derive any pleasure from the contact. [Doc. 49-1 at 3]. Howald complied with Herrington's requests to visit the apartment because she felt that Herrington would "hunt" her on campus if she did not visit Herrington. [Doc. 49-3 at 32]. In fact, on occasions that Howald did attempt to avoid visiting Herrington, she recalls having to hide in other students' closets and remembers that the other students would lie to Herrington when she came looking for Howald. [Id. at 49]. Howald did not tell anyone about the abuse because she thought that she would be expelled from the school if she reported Herrington's actions. [Id. at 32-33].

---

[5] Howald's mother worked as a camp counselor at Ben Lippen and hosted a movie night that Herrington and school students attended. [Id. at 7, 33-34]. Howald was in her room during the movie because she did not want to watch the movie, and Herrington went upstairs to Howald's bedroom and abused Howald. [Id. at 33].

Although Howald graduated early at the end of her junior year, Herrington's abuse did not stop. [Id. at 35]. Herrington told Howald's parents that she needed Howald to come to campus following graduation to help Herrington pack up her apartment to prepare for a move. [Id.]. Although Howald had graduated, she still felt she could not tell anyone about the abuse because Herrington had written a letter of recommendation for Howald for college and Howald felt that Herrington could still exert power and influence over her future. [Id.]. Herrington's abuse only stopped when she moved away. [Id.].

Howald has suffered long-term emotional impacts from Herrington's abuse. She suffers from PTSD, has difficulty with sexual intimacy, and has difficulty trusting people. [Doc. 49-1 at 5]. Her marriage has suffered as a result of her emotional trauma. [Id.].

In 2005, Howald contacted Herrington because she was looking for an explanation of the abuse. [Doc. 49-3 at 42]. Although the two met and had dinner, Howald noted that she did not get any substantive explanation and that the meeting did not help her emotionally. [Id.]. In 2010, Howald again contacted Herrington because, although she was in therapy, she was feeling suicidal and was still hoping for an explanation. [Id. at 43]. The two met again and Howald still felt she had not been given an explanation or obtained any

7

closure. [Id. at 45]. Howald ended the 2010 meeting by telling Herrington that the "next time [she met Herrington] would be in a courtroom." [Id.]. However, Howald did not contact the police or otherwise take legal action at that time because her parents were still alive, and she thought learning of the abuse would upset her father too much. [Id.].

In 2016 and 2017, Howald's parents passed away. [Id. at 47]. At that point, Howald felt comfortable going to the police. [Id.]. Howald contacted the Asheville Police Department ("APD"), and the APD investigated the allegations. [Id.]. The APD contacted law enforcement in Texas, who contacted Herrington and interviewed her. [Id. at 49]. In that interview, Herrington admitted to "inappropriate" touching of Howald and told officers that the abuse occurred on more than one occasion. [Doc. 49-1 at 7-8]. The APD has informed Howald that they are unable to bring charges against Herrington in North Carolina because of the statute of limitations. [Id. at 48].

## IV. DISCUSSION

Howald alleges that Herrington committed the torts of assault, battery, IIED, and false imprisonment.[6] Howald also argues that Herrington's actions warrant punitive damages.

---

[6] Howald's Complaint also alleges constructive fraud and NIED; however, those causes of action were only asserted against Ben Lippen, who has been dismissed from this case. [Doc. 1-1]. Howald attempts to seek summary judgment against Herrington on these

8

## A. Statute of Limitations & SAFE Child Act

The North Carolina statute of limitations for battery, false imprisonment, and IIED is three years. N.C. Gen. Stat. § 1-52. However, the North Carolina SAFE Child Act, ch. 245, 2019 N.C. Sess. Laws 1231, included a provision effective from January 1, 2020, through December 31, 2021, that "revive[d] any civil action for child sexual abuse otherwise time-barred under G.S. 1-52 as it existed immediately before the enactment of this act." Id. § 4.2(b). Thus, Howald's claims are not time barred as she filed this action on November 15, 2020, and has alleged that she was a minor at the time of the sexual abuse.

## B. Assault & Battery

Howald's First Claim for Relief alleges that Herrington assaulted and battered Howald. A battery is "the offensive touching of the person of another without [her] consent, while an 'assault' occurs when a person is put in apprehension of harmful or offensive contact." City of Greenville v. Haywood, 130 N.C. App. 271, 275, 502 S.E.2d 430, 433 (1998) (quoting Ormond v. Crampton, 16 N.C. App. 88, 94, 191 S.E.2d 405, 409-10 (1972)). Liability for battery "hinges on the defendant's intent to cause a harmful or offensive

---

claims, but because the Complaint does not allege those claims against Herrington, Howald's Motion for Summary Judgment is denied with respect to those causes of action.

9

contact." Andrews v. Peters, 75 N.C. App. 252, 256, 330 S.E.2d 638, 641 (1985). "A bodily contact is offensive if it offends a reasonable sense of personal dignity." Id. (internal quotation marks omitted) (quoting Restatement (Second) of Torts § 13 (Am. L. Inst. 1965)).

Here, the Plaintiff's forecast of evidence, which is uncontested, establishes that Herrington assaulted and battered Howald on multiple occasions. It is undisputed that this touching was intentional: Herrington groped Howald on multiple occasions for her own pleasure. Further, Herrington's actions—groping Howald, lying on top of her without consent, grinding against her leg—fall far beyond the threshold of what a reasonable person would consider offensive. Thus, the Court concludes that Herrington is liable for battery of Howald. It follows that Herrington is liable for assault—having experienced Herrington's abuse on multiple occasions, Howald was aware of the imminence of offensive contact when she was alone with Herrington. Thus, the Court concludes that Herrington is liable for assault of Howald.

### C. False Imprisonment

Howald's Fourth Claim for Relief alleges that Herrington falsely imprisoned her. False imprisonment is the unlawful, involuntary restraint of another. Black v. Clark's Greensboro, Inc., 263 N.C. 226, 228, 139 S.E.2d

10

Case 1:21-cv-00059-MR-WCM   Document 57   Filed 10/31/22   Page 10 of 16

199, 201 (1964). The elements for a claim of false imprisonment are: "(1) the illegal restraint of plaintiff by defendant, (2) by force or implied threat of force, and (3) against the plaintiff's will." Rousselo v. Starling, 128 N.C. App. 439, 449, 495 S.E.2d 725, 732 (1998). There is no "appreciable period of time" required to satisfy the restraint element; all that is required is "sufficient time for [the plaintiff] to recognize [her] illegal restraint." West v. King's Dept. Store, Inc., 321 N.C. 698, 703, 365 S.E.2d 621, 624 (1988).

Here, the undisputed forecast of evidence shows that Herrington falsely imprisoned Howald by lying on top of her and pinning her down to abuse her. Howald was restrained in place against her will using the force of Herrington's body weight. Howald was aware of this restraint, satisfying the time period required for false imprisonment. Thus, the Court concludes that Herrington is liable for false imprisonment of Howald.

### D. Intentional Infliction of Emotional Distress

Howald's Sixth Claim for Relief alleges that Herrington intentionally inflicted emotional distress upon Howald. The essential elements of a claim for IIED are: (1) extreme and outrageous conduct by the defendant, (2) which is intended to and did in fact cause (3) severe emotional distress. Dickens v. Puryear, 302 N.C. 437, 452, 276 S.E.2d 325, 335. "Conduct is extreme and outrageous when it is 'so outrageous in character, and so extreme in degree,

11

as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Smith-Price v. Charter Behavioral Health Sys., 164 N.C. App. 349, 354, 595 S.E.2d 778, 783 (2004) (quoting Briggs v. Rosenthal, 73 N.C. App. 672, 677, 327 S.E.2d 308, 311 (1985)). The threshold determination of whether the alleged conduct may be considered extreme and outrageous is a question of law for the court. Id.

North Carolina courts have held that unwanted sexual contact can constitute extreme and outrageous conduct. In Watson v. Dixon, the court concluded that the defendant's cruel practical jokes, obscene sexual comments, unwanted touching, and veiled threats over seven or eight months constituted extreme and outrageous behavior. 130 N.C. App. 47, 53, 502 S.E.2d 15, 20 (1998). In Watson, the court focused both on the nature of the conduct and the "length of time that the conduct occurred" to reach its conclusion. Id.

However, North Carolina courts have also clarified that a sexual battery, "standing alone," does not automatically constitute extreme and outrageous conduct. Wilson v. Bellamy, 105 N.C. App. 446, 468, 414 S.E.2d 347, 359 (1992). In Wilson, the defendants kissed and touched the plaintiff when she was intoxicated and unconscious. Id. The court in that case found

that the conduct, without more, did not meet the extreme and outrageous standard required for an IIED claim. Id.

Here, Herrington's conduct is squarely beyond the bounds of decency of a civilized society. Herrington abused Howald, a minor, over an extended period of time—the months spanning almost her entire junior year of high school. Herrington used her authority over Howald and her position of trust at the school to gain access to Howald and abuse her, and on the occasions when Howald tried to resist by refusing to visit Herrington, Herrington hunted her down. Herrington's behavior went far beyond the single instance of battery that the Wilson court found insufficient to meet the requirements of the first prong of an IIED claim—rather than a single instance of unwanted touching, Herrington engaged in a routine course of abuse for months, including abusing Howald in her own home. Thus, considering both the nature of this abuse and the length of time for which it persisted, the Court concludes that Herrington's behavior was extreme and outrageous.

Additionally, Herrington's actions satisfy the intent prong. The intent element of an IIED claim is met when the "defendant's actions indicate a reckless indifference to the likelihood that they will cause severe emotional distress." Dickens v. Puryear, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981). Here, Herrington's months-long sexual abuse of Howald was

13

perpetrated with reckless indifference to how it would affect Howald. A reasonable person would foresee that repeated sexual abuse by a figure of authority would cause the victim of that abuse severe emotional distress. Accordingly, the second prong of the IIED claim is met.

Lastly, Howald did in fact suffer severe emotional distress as a result of Herrington's abuse. Howald has PTSD as a result of the abuse she suffered. She also has had marriage problems, difficulty with intimacy, and difficulty trusting people stemming from this abuse. Although Howald has been in therapy for many years, she still reports severe depression due to Herrington's actions. Thus, the Court concludes that all three prongs of a claim for IIED are satisfied and that Herrington is liable to Howald for IIED.

### E. Punitive Damages

Howald's Complaint alleges that Herrington's conduct warrants an award of punitive damages. Punitive damages are available to plaintiffs in North Carolina to punish defendants for egregiously wrongful acts and to deter the commission of similar wrongful acts. N.C. Gen. Stat. § 1D-1. A plaintiff can recover punitive damages only by proving the existence of one of three aggravating factors by clear and convincing evidence: (1) fraud; (2) malice; or (3) willful or wanton conduct. Id. § 1D-15.

"Willful and wanton conduct" is defined as the "conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm." Id. § 1D-5(7). North Carolina courts have recognized the close relationship between "extreme and outrageous" conduct required for IIED claims and conduct that would warrant punitive damages. See Watson, 130 N.C. App. at 55, 502 S.E.2d at 21.

Here, the analysis leading to the conclusion that Herrington's behavior was extreme and outrageous is instructive. Herrington's routine abuse was perpetrated with conscious disregard to the physical and emotional pain it would cause Howald. Herrington should have known that it was likely that her repeated sexual abuse would cause harm to Howald. Thus, this conduct was willful and wanton and the Court concludes that Howald's forecast of evidence warrants an award of punitive damages.

### F. Damages

Neither Howald's Complaint nor her Motion for Summary Judgment conclusively establishes an amount of damages. Thus, the parties are ordered to provide supplemental briefing on the issue of damages. Such briefing should address whether either party requests a jury determination of the damage award.

15

## V. CONCLUSION

For the reasons set forth above, **IT IS, THEREFORE, ORDERED** that Howald's Motion for Summary Judgment [Doc. 49] is **GRANTED IN PART** and **DENIED IN PART**. Specifically, the Court **GRANTS** Howald's Motion on the issues of Herrington's liability for assault, battery, false imprisonment, and intentional infliction of emotional distress, and on the issue of whether Herrington's actions warrant an award of punitive damages. The Court **DENIES** Howald's Motion to the extent it seeks summary judgment on claims that were originally only asserted against Ben Lippen.

**IT IS FURTHER ORDERED** that the parties shall provide supplemental briefing as to the issue of damages. The parties shall include in their briefs whether either is requesting a jury determination of damages.

**IT IS SO ORDERED.**

Signed: October 30, 2022

Martin Reidinger
Chief United States District Judge